IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| **v.** | CRIMINAL NO. 14-058-JKB |
| DELLANDO CAMPBELL, | |
| Defendant | |

RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SENTENCING REDUCTION

Defendant Campbell seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the fact that he does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic, the incredible seriousness of the crime he committed, and the danger that the defendant presents to the community, the time remaining on his sentence, and all other considerations under 18 U.S.C. § 3553(a).

BACKGROUND

On June 5, 2009, Serika Dunkley Holness ("the victim") was married to Ryan Holness ("Holness") and was the "spouse" of Ryan Holness for purposes of 18 U.S.C. § 2261 (a)(1).[1] They were married in Jamaica in June 2003. The victim was born in Jamaica in 1982. Holness was born in Jamaica in 1980.

Holness enlisted in the U.S. Navy in 2002. On June 5, 2009, Holness was stationed at the Patuxent River Naval Air Station and resided in Lexington Park, St. Mary's County, Maryland. In June 2009, the victim worked and resided in New York, NY.

---

[1] The factual background comes from the Amended Presentence Report in this case. ECF 32 ¶¶ 6-27.

Dellando Campbell ("the Defendant") and Ryan Holness knew each other since late 2002 when they served together in the U.S. Navy. The Defendant left the Navy in 2006. And, in June 2009, the Defendant was residing in Clayton County, Georgia.

Since early 2008, Holness was a Navy air traffic controller. In April 2009, Holness requested early release from the naval service. His request for early release from the Navy was denied because Holness was under criminal investigation for making false declarations in connection with a United States passport application for his minor son, who lived in Jamaica. In June 2008, Holness made a written admission to investigators to making false declarations for the purpose of fraudulently obtaining a passport for his son.

As a result, in June 2009, Holness was facing court-martial proceedings. These proceedings jeopardized Holness's naval career and the prospect of future civilian employment as an air traffic controller. Pending conclusion of the court martial, Holness was reassigned to "busy work" duties, to which he was still assigned in June 2009.

On November 5, 2008, while the court martial was pending, Holness represented himself to be the victim when he completed an on-line application for a $500,000 life insurance policy for the victim from the HSBC Insurance Group. Holness designated himself as the sole beneficiary of that policy. The monthly premiums were paid with Holness's VISA card. The policy would not have been issued had the insurer known that Holness purchased the policy.

In early June 2009, Holness implemented a plan he devised to travel to New York from Maryland to induce the victim to return to Maryland with him for the ostensible purpose of co-signing a lease on Holness's townhouse. The victim's signature on the lease was necessary in order for Holness to receive a rent discount for service members. Holness planned to murder the victim during the trip from New York to Maryland and to make the murder appear to have been

1

committed by an unknown carjacker.  Holness's plan required that the murder be committed with a knife rather than a firearm, as a scenario including a knife would lend itself to Holness's description of a struggle which would account for the recovery of blood and DNA evidence of the ostensible carjacker at the murder scene and from Holness's 2007 blue Honda sedan.  The DNA of an unknown third person – "the carjacker" – was crucial to Holness's plan to convince the authorities that his account of a fatal carjacking was truthful.  To effectuate his plan to murder the victim and collect the life insurance proceeds, Holness required an accomplice to drive the Honda from the scene of the "carjacking" and to contribute DNA "evidence" in the form of blood and DNA planted at the murder scene and inside the Honda.  The discovery by the police of unknown DNA was intended to prove the existence of the purported carjacker and corroborate Holness's account that the victim was murdered by a knife wielding carjacker, who was also cut during the struggle.

Between May and June 4, 2009, Holness contacted the Defendant by phone and text at least 34 times in the course of which Holness arranged for the Defendant to travel to New York City from Georgia to assist in the murder of the victim.  On June 4, 2009, Holness stated explicitly to the Defendant that he was going to kill the victim.  Holness told the Defendant that he needed the Defendant's assistance to make the murder appear to have been committed during a carjacking on the drive to Maryland.  It was also found that while he was in New York in early June, Holness paid to have tint installed on the windows of the Honda.

On the evening of June 4, 2009, Holness drove the Defendant and the victim from New York to Maryland.  At around 1:30 a.m. on June 5, 2009, Holness, the Defendant, and the victim arrived at a rural area along MD Route 290, just south of MD Route 291, in Crumpton, Kent County, Maryland.  Holness parked the Honda on a farm access road.  The murder of the victim

2

occurred in the adjoining fields on either side of Route 290 where the victim was repeatedly assaulted with a knife, resulting in her death. The autopsy of the victim by the Maryland Office of the Chief Medical Examiner revealed that she suffered eleven sharp force injuries (stab wounds) and several blunt force injuries. The cause of death was determined to be multiple sharp force injuries to the victim's chest and the front and back of the victim's neck. The stab wounds included one that cut the left jugular vein and another that severed her thyroid gland and windpipe.

In order to corroborate Holness's account to the police that the victim was murdered by a carjacker, the Defendant assisted Holness to stage the crime scene to include blood and DNA "evidence" contributed by the Defendant. The Defendant conspicuously deposited droplets of his blood at various locations inside the passenger compartment of the Honda and on several of the victim's personal items that were placed at the crime scene in contemplation of discovery by the police. Items at the murder scene from which the Defendant's DNA was later recovered included the victim's purse, one of her sandals and a paperback book. The Defendant then drove the Honda, guided by a GPS system, to a location between 6th and 7th Streets NW, Washington, D.C., where the Honda was abandoned by parking it a manner obstructing traffic that made it virtually certain that the Honda would be discovered. The Honda was in fact located and seized by homicide investigators later on June 5, 2009. A subsequent search of a personal computer seized from Holness's residence revealed that in late May and early June 2009, Holness conducted several Google searches of Apex and Greyhound bus schedules for stops within a few blocks of where the Honda was abandoned in Washington.

The driving time from the scene of the murder to where the Honda was recovered was about one hour and 21 minutes. Holness therefore had to delay at least that long before "reporting" the carjacking and murder to allow sufficient time for the Defendant to drive the Honda to

Washington, drop it off and leave the area by bus.  No murder weapon was recovered, but a track of Holness's scent (obtained from his clothing) by a Maryland State Police bloodhound revealed that Holness walked south from the murder scene to the middle and edge of the Route 290 bridge over the Chester River, about .25 miles away.  Holness was also tracked to a residence near the Route 290 bridge.  At 3:27 a.m., Holness knocked on the front and back doors of this house, with no response from the residents, who reported the knocking but did not open the door.

At about 5:30 a.m. on June 5, 2009, Holness walked to a residence about 500 yards north of the murder scene (that is, in the opposite direction from the Chester River Bridge) and told residents there that he and his wife had been carjacked on their way from New Jersey and that his wife was in a nearby field.  Kent County Police officers who responded to that location observed a laceration on Holness's left arm and a piece of duct tape hanging from Holness's neck.  They located the deceased victim in a field about 500 yards south of the house, where they also observed fresh tire tracks left in the mud by Holness's Honda.

Holness told these officers that he and his wife left New York the previous evening and were carjacked at a rest stop on the New Jersey Turnpike when they stopped to get something to drink.  Holness stated that when he returned to his car (Honda) there was a man with a gun in the back seat.

Holness was transported to the emergency room at the Chester River Hospital Center where he arrived at about 6:57 a.m.  The treating physician reported that, "Patient states that he and his wife were carjacked in New Jersey and driven to the local area. It is unclear at this time when the patient was injured, patient is very vague about details."  Holness told a nurse that "the incident began around 1:30 this morning," more than four hours before Holness arrived to report the "carjacking."  Holness's condition was unremarkable except for a laceration to his left arm, which

Holness claimed was inflicted by the carjacker. No injury was found to Holness's jaw or his wrists nor did the doctor observe any evidence of an injury that would account for Holness's claim that he was kicked in the head by the carjacker and rendered unconscious for the four hours that elapsed before he went for help. Subsequent examination of scrapings from the pants Holness was wearing revealed fragments of what appeared to be "glittery" blue and pink nail polish. Five fragments of blue, red and yellow nail polish were also recovered from scrapings from the shirt Holness had been wearing. These scrapings were found to match the nail polish observed on Ms. Dunkley's broken finger and toe nails. The medical examiner had noted defensive wounds on the victim's hands and fingers, several of which were severely sliced.

Holness repeated his account of a carjacking in statements he made later that morning to Maryland State Police Homicide Detective Sgt. Steve Hall. Holness stated that he and the victim left his mother's home in Brooklyn on the night of June 4. Holness stated that he and the victim were married but did not live together, and they were going to Lexington Park, MD, for the victim to co-sign a lease for Holness's townhouse in order for Holness to obtain a discount for married military personnel. Holness stated that he planned to drive his wife back to New York after signing the lease on June 5.

Holness explained that after leaving New York with his wife, he stopped at a rest stop on the New Jersey Turnpike to purchase gas. A credit card receipt recovered from the Honda put the time of that purchase as 11:14 p.m. on June 4, 2009. Holness stated that after pumping the gas, he pulled into a truck parking area at the rest stop, got out and urinated between some parked trucks. Holness stated that when he returned to his car, there was a "masked person" in the back seat with a gun pointed at his wife's head. Holness stated that he could not originally say whether the person was a man or a woman because the carjacker was using some sort of device to distort his voice.

5

Holness said that the person ordered him to get back on the turnpike and drive, so Holness "just continued" to follow his normal route to Maryland.

Holness told Sgt. Hall that they arrived in Crumpton, MD, at about 1:30 a.m., and that the carjacker "directed him to pull into the farm lane." Holness stated that the carjacker directed him and his wife to get out of the car. When they were all standing on the driver's side of the car, the carjacker started to tape Holness's hands with duct tape. Holness stated that while he was being bound with duct tape, his wife bolted and ran around the car to the passenger side. Holness stated that the carjacker chased her and Holness heard her scream, "he's cutting me." Holness stated that when he ran after his wife, the carjacker came after him with the knife. The carjacker slashed at Holness's neck, but the knife struck Holness in his uplifted arm. Holness stated:

> He laid on the ground with me, too, and then I don't know what happened. He just jumped in the car and left. No. Before that, before that--sorry. He ran down to the car. I don't know. He backed up a little bit and he came back and he gave me one kick in the side of my chin right here on my jaw and I'm knocked out.
>
> Question [Sgt. Hall]: So–
>
> Answer [Holness}: And when I wake up, I was like this, from what I remember.

Holness stated that he was kicked in the head and knocked unconscious, and he demonstrated how his wrists and ankles were taped together when he regained consciousness four hours later. Holness told police that he used a piece of plastic he found on the road to cut the tape, and, upon freeing himself, he walked directly to the house where he reported the crime. Holness reached the house at about 5:45 a.m. Police arrived at 5:50 a.m.

No roll of duct tape was found at the scene. However, a roll of silver duct tape was recovered from under the driver's seat of the Honda when it searched after being located in Washington. Forensic testing showed that the roll of duct tape recovered from the Honda was the

source of the duct tape fragments found on Holness's person and those that were scattered about the murder scene where Holness claimed to have regained consciousness.

Holness was found to be the source of DNA recovered from three swabs of the inside of the cardboard roll of the duct tape recovered from the Honda. The Defendant's DNA was also recovered from a swab of the same cardboard part of the roll of the duct tape found in the Honda. The recovery of the roll of duct tape from the Honda indicates that the Honda remained at the murder scene until such time as duct tape could be removed from the roll to place on Holness and at the murder scene in order to corroborate Holness's false carjacking story.  Leaving the roll of duct tape in the Honda to be discovered by the police also provided additional corroboration for Holness's false account of a carjacking.  Another indication that the Honda remained at the murder scene for a period of time is that at about 1:30 a.m. on June 5, 2009, witness Peggy Barnes saw a blue car parked on the west side of the road while she drove southbound on Route 290 (past the murder scene).  She stated that the blue car's "trunk popped up" as she drove by.

On June 5, 2009, Holness was arrested and charged with First Degree (premeditated) murder in violation of Maryland law.  While being held in pretrial detention in Kent County, Holness asked another prisoner to draft a purported third party "confession" to the carjacking and murder.  Holness instructed the cellmate to mail the detailed confession to the police from Washington, D.C. upon the cellmate's release, which was imminent.  Instead, the cellmate informed the state police of Holness's efforts.  Several pages of third-party confessions, including pages written by Holness, were recovered from Holness's cell by the state police.

In November 2009, Holness was charged federally with interstate domestic violence and related charges and pled not guilty.  *United States v. Holness*, No. 09-0611, ECF No. 1, 25, 56.  In March 2011, Holness went to trial before Judge William M. Nickerson of the U.S. District Court

for the District of Maryland. *United States v. Holness*, No. 09-0611, ECF No. 68-86. Following a ten-day trial, a jury found Holness guilty of three counts: interstate domestic violence resulting in death, in violation of 18 U.S.C. § 2261, attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and attempted witness intimidation, in violation of 18 U.S.C. § 1512(b)(1). *United States v. Holness*, No. 09-0611, ECF No. 93. Judge Nickerson sentenced Holness to life in prison on Count One (interstate domestic violence resulting in death) and 240 months on attempted witness intimidation. *Id.* ECF No. 103.

Through the investigation, trial, and the sentencing of Holness – and for almost three years thereafter – the identity of the common source of the DNA recovered at the scene, from inside the Honda and from the roll of duct tape found in the Honda, was attributed to "Unknown Male #1," and remained unknown until late 2013. The DNA profile of Unknown Male #1, however, was entered into the national CODUS DNA Data base, where it was regularly compared to DNA profiles recovered in the interval. On October 22, 2013, a sample of the Defendant's DNA was routinely obtained by police in Lemoore, California. In January 2014, the California Department of Justice notified the Maryland State Police that the Defendant's DNA profile matched that of Unknown Male #1 in the Maryland homicide case file. Subsequent testing by the Maryland State Police Crime Lab has confirmed that the Defendant's DNA profile matches the DNA profile of Unknown Male #1 and, specifically, that the Defendant is the source of DNA attributed to Unknown Male #1 that was recovered from the passenger compartment of the Honda, from the roll of duct tape found in the Honda, from blood recovered from the victim's purse and sandal, and blood recovered from pages of a paperback book recovered at the murder scene.

The Defendant was arrested by the Maryland State Police and the FBI in Lemoore, California on February 7, 2014.  After being advised of and waiving his Miranda rights, the Defendant made a statement that included the following:

- That he knew Holness from serving with him in the U.S. Navy on the U.S.S. Constellation;
- That in June 2009 the Defendant lived in Georgia;
- The Defendant stated that just before the murder, Holness called him and asked him to come to New York and that Holness wired him $400 for a bus;
- That on June 4, 2009, the defendant took an overnight bus from Georgia to New York; he met with Holness in New York City on the afternoon of June 4, 2009;
- In New York, Holness told the defendant that he needed the defendant to assist him in his "plot" to kill his wife; Holness referred to his "plans" and wanted the defendant to help or to actually "do it;" Holness told the defendant that he needed him to "be part of it [the murder plan] to collaborate something." Holness stated to the defendant several times that he was going to kill his wife;
- The defendant was in the Honda when Holness picked up the victim in New York City; the defendant, Holness and the victim left New York in the Honda for Maryland; Holness drove, the victim sat in the front passenger seat and the defendant was in the back seat;
- They drove for about two hours at which point Holness pulled the Honda into a farm field where Holness repeatedly assaulted the victim with a knife;
- The defendant drove the Honda from the murder scene alone and followed the directions in a portable GPS device he found in the Honda. The defendant drove to a city (he believe to be Baltimore) where the defendant abandoned the Honda a took a bus to Georgia;
- The police in Lemoore, California obtained swabs of the defendant's DNA in October 2013;
- The defendant stated that Holness assaulted and stabbed the victim and denied knowledge of the insurance policy Holness had taken out on the victim;
- The defendant denied that he assisted Holness in the murder of the victim.

On February 4, 2014, Dellando Campbell ("Petitioner") was charged in a one-count Indictment with traveling in interstate commerce with the intent to kill and injure a spouse resulting in murder, in violation of 18 U.S.C. § 2261.  ECF No. 1, Indictment.  On July 28, 2014, Petitioner pled guilty to Count One of the indictment, based on an agreement between the parties (pursuant to Rule 11(c)(1)(C)) that the appropriate sentence was 360 months.

On November 5, 2014, Judge William Nickerson sentenced the Defendant to 360 months in prison and a 60-month term of supervised release. Petitioner's guidelines sentencing range was 360 months to life, based on the final offense level of 41 and a criminal history category of II. PSR at ¶ 47.

The defendant subsequently filed a motion to vacate his sentence, pursuant to 28 U.S.C. § 2255, which was denied. ECF No. 40, 50, 51. He appealed that Order, which appeal was dismissed. ECF No. 52, 57.

On July 20, 2021, Petitioner filed a *pro se* Motion for Compassionate Release (ECF No. 61) claiming that he should be granted compassionate release based, not on any medical issue, but rather based on the length of his sentence and alleged rehabilitation. Specifically, Petitioner relies on the Fourth Circuit's decision in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) to claim that an alleged "disparity" between his current sentence and the sentence certain others involved in murders received calls for compassionate release. On August 26, 2021, the Federal Public Defender declined to supplement Petitioner's motion. (ECF No. 63.)

The government does not concede that *McCoy* was rightly decided, but nevertheless responds that Petitioner's claim does not rise to the level of "extraordinary and compelling" established by the Fourth Circuit in *McCoy*. Accordingly, Petitioner's request should be denied.

## I.   **LEGAL FRAMEWORK**

The federal sentencing statute provides that an inmate cannot move for compassionate release until he has exhausted administrative remedies with the BOP or by showing that the BOP failed to respond to her request within 30 days.[2]   Once the inmate exhausts administrative remedies and confers authority on the Court to rule on his motion, the Court can only reduce the inmate's sentence upon a showing of "extraordinary and compelling reasons" warranting the reduction, that the inmate is no longer a danger to the community, and that the reduction would be consistent with the relevant Sentencing Commission policy statement and 18 U.S.C. § 3553(a) factors.   The following sections explain this legal framework in detail.

### A.  Court's authority to adjudicate motions for compassionate release.

Under 18 U.S.C. § 3582(b), the district court has only limited authority to modify a final sentence.  *Dillon v. United States*, 560 U.S. 817, 824-25 (2010) (noting that under Section 3582, the Court generally "may not modify a term of imprisonment once it has been imposed"); *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial change of heart") (internal quotation omitted); *United States v. Brown*, RDB-16-553, at 2 (D. Md. Mar. 26, 2020) (holding that the Court "may not modify the sentence imposed . . . unless certain limited circumstances arise or as permitted under Rule 35 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582(c)").  Section 3582(c)(1)(A)(i), commonly termed the "compassionate release" provision, provides one such exception by permitting courts to reduce a previously imposed term of imprisonment upon finding that

---

[2]     For the purpose of this opposition, the government uses the term "exhaustion" to include the scenario where the BOP does not respond within 30 days of the inmate's request for compassionate release.

"extraordinary and compelling reasons" exist for doing so, consistent with the applicable policy statements of the Sentencing Commission.

As amended by the First Step Act, Section 3582(c)(1) permits the Court to reduce the inmate's term of imprisonment provided that the inmate has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or the inmate shows "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Nance*, 2020 WL 114195, at *2 (W.D. Va. Jan. 10, 2020). Here, the defendant has exhausted his administrative remedies. *See* Exhibit 1 – Ltr. from Warden.

## B. Grounds for compassionate release.

After exhaustion of administrative remedies, the statute establishes a two-step inquiry:

> **First**: The Court must determine if an inmate is eligible[3] for a sentence reduction that is: (A) warranted by "extraordinary and compelling reasons;" and (B) consistent with applicable Sentencing Commission Policy Statements.
>
> **Second**: If the Court finds inmate is eligible for compassionate release, it must then consider whether a sentence reduction is warranted according to the factors set forth in 18 U.S.C. § 3553(a).

*See* 18 U.S.C. § 3582(c)(1)(A); *see also Dillon*, 560 U.S. at 826-27 (holding that parallel language in Section 3582(c)(2) establishes a similar two-step inquiry)).

The burden is on the inmate to demonstrate that he has exhausted administrative remedies and that there are extraordinary and compelling reasons to reduce his sentence. 18 U.S.C. §

---

[3]    Certain defendants at least 70 years old are eligible for sentence reductions, a provision not applicable in the instant case. *See* 18 U.S.C. § 3582(c)(1)(A)(ii)

3582(c)(1)(A); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility). Even for those inmates who are statutorily eligible for a reduced sentence, compassionate release is a "rare" and "extraordinary" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).

### C. 18 U.S.C. § 3582(c)(1)(A)(i).

The compassionate release provision of § 3582(c)(1)(A), adopted as part of the Sentencing Reform Act of 1984, originally permitted judicial relief only upon a motion by the Director of the Bureau of Prisons ("BOP"). Previously, a defendant could only petition the BOP Director for compassionate release, who could then move the district court for compassionate release. *United States v. Webster*, 2020 WL 618828, at *1 (E.D. Va. Feb. 10, 2020) (citing U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n. 4 (U.S. Sentencing Comm'n 2018)).

On December 21, 2018, however, Congress passed the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194. Section 603(b) of that Act amended § 3582(c)(1)(A) to allow defendants, in specified circumstances, to file motions for compassionate release directly with the court of conviction. *See* First Step Act, § 603(b). Section 3582(c)(1)(A), as amended by the First Step Act, provides in relevant part:

> (c) Modification of an imposed term of imprisonment. — The court may not modify a term of imprisonment once it has been imposed except that —

> (1) in any case.—

> > (A) the court, upon motion of the Director of the Bureau of

13

Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction;

> . . .

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

As was the case prior to enactment of the First Step Act, § 3582(c)(1)(A) permits compassionate release based on "extraordinary and compelling reasons." *Id*. The Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

In other words, once the inmate satisfies the statute's exhaustion requirement, the Court may reduce the inmate's sentence, but only if it finds that the inmate is eligible for compassionate release — that is "extraordinary and compelling reasons warrant such a reduction," and that a sentence reduction is consistent with applicable policy statements, including, as discussed below, that the inmate is no longer a danger to the community. *See Dillon*, 560 U.S. at 826-27 (holding that Section 3582(c) permits a sentencing reduction only when that reduction would be "consistent

with applicable policy statements issued by the Sentencing Commission") (citing U.S.S.G. § 1B1.10 (policy statement for Section 3582(c)(2) sentencing reductions)).

### D. U.S.S.G. § 1B1.13 Policy Statement

Because § 3582(c)(1)(A) permits a sentencing reduction only where "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission," the pertinent policy statement, found at U.S.S.G. § 1B1.13, is binding on the Court.  18 U.S.C. § 3582(c)(1)(A); *see also Dillon*, 560 U.S. at 827 (Because § 3582(c)(2) only permits sentence reductions "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the applicable policy statement is binding).

The Sentencing Commission Policy Statement implementing 18 U.S.C. § 3582(c)(1)(A) states that the Court may reduce a term of imprisonment if it determines that, in relevant part, the requested reduction of the defendant's sentence meets each of three criteria:

> (1) extraordinary and compelling reasons warrant the reduction;
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and,
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

"[T]he Sentencing Commission is responsible for defining what should be considered extraordinary and compelling reasons for sentence reduction under § 3582(c)(1)(A)."  *United States v. Hiller*, ELH-18-389, 2020 WL 2041673 at *3 (D. Md. April 28, 2020) (citing 28 U.S.C. § 994(t)) (further citation and internal quotation marks omitted).  The Commission's Policy Statement, Application Note 1 of § 1B1.13, defines "extraordinary and compelling reasons" as follows:

15

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2),[4] extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of Defendant.— The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.— As determined by the Bureau of Prisons, there exists in the defendant's case an extraordinary or compelling reason other than, or in combination with,

---

[4] As discussed above, subsection (2) of § 1B1.13 requires that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 app. note 1.

Additionally, pursuant to the mandate in § 994(t), Application Note 3 states: "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 app. note 3.

As discussed above, it is the government's position that the Commission's Policy Statement is binding on the courts. The Government recognizes, however, that in its recent decision in *United States v. McCoy*, the Fourth Circuit held otherwise. In *McCoy*, the Court wrote: "There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2020)) (emphasis in original). The Court also held that the "Other Reasons" category at Application Note 1(D) is not limited to other reasons identified by BOP. *Id*. The Government acknowledges that the mandate issued on January 22, 2021, thus the holding in *McCoy* is controlling for this Court on this issue. However, we do not concede that the case was decided correctly and we note our objections for purposes of any subsequent appeal. In any event, the *McCoy* decision should not result in a grant of Petitioner's request.

### E. BOP Program Statement 5050.50

The policy statement in § 1B1.13 is not the only source of criteria the Court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction. As detailed above, Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 app. note 1(D) (emphasis added). Pursuant to this power, the BOP has issued a policy statement outlining the circumstances that it will permit a compassionate release request. This BOP regulation appears at Bureau of Prisons Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205.[5] Notably, both the Guideline policy statement in § 1B1.13 and BOP Program Statement 5050.50 limit "extraordinary and compelling reasons" for compassionate release to circumstances involving illness, declining health, age, or exceptional family circumstances.

While Program Statement 5050.50 contains standards that are both more extensive than, and slightly different from, those set forth under § 1B1.13(1)(A) of the policy statement, BOP's program statement and determination regarding Petitioner's eligibility for relief is nonetheless entitled to appropriate deference. *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statements, which do not require notice and comment, are entitled to "some deference" where they reflect a "permissible construction of the statute") (internal quotation marks omitted). However, to the extent that the program statement and the policy statement conflict, it is the Sentencing Commission's policy statement – the source directly authorized by statute – that is binding.

Establishing the criteria in Program Statement 5050.50 and Application Note 1 to § 1B1.13 is just the first step of a multi-step inquiry that ultimately results in the court weighing the factors set forth in 18 U.S.C. § 3553(a) to determine if the "rare" and "extraordinary" remedy of

---

[5] The Program Statement is available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This program statement was amended effective January 17, 2019, following passage of the First Step Act. It replaces the previous program statement, 5050.49, CN-1.

compassionate release is appropriate.  *See Chambliss*, 948 F.3d at 693-94; *White*, 378 F. Supp. 3d at 787; *Mangarella*, 2020 WL 1291835, at *2-3.

**F.   Consideration of the § 3553(a) sentencing factors.**

If the Court determines that the inmate is eligible for a sentencing reduction, the Court must then consider whether an exercise of its discretion to reduce the inmate's sentence is warranted according to the factors set forth in Section 3553(a) factors and determine whether to exercise its discretion to reduce the inmate's sentence.  *Dillon,* 560 U.S. at 827, 18 U.S.C. § 3582(c)(1)(A).

Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes described in § 3553(a)(2):

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).  In imposing the sentence, the court shall consider *inter alia* "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

**G.   BOP Response to COVID-19.**

The BOP has taken aggressive action to mitigate the danger of COVID-19.  In early 2020, the agency established a COVID-19 working group to develop responsive procedures in consultation with experts from the Centers for Disease Control ("CDC"). On August 5, 2020, the Bureau of Prisons implemented Phase Nine of its Action Plan ("action plan") in order to minimize

the risk of COVID-19 transmission into its facilities, extending prior mitigation measures, to include enhanced modified operations for all institutions, and to implement new measures to manage the pandemic.[6]  Phase Ten began on October 1, 2020, extending the efforts previously described in Phase Nine, and was scheduled to remain in place through at least October 31, 2020. Phase Nine was extended on November 1, 2020.  All measures will remain in place until further notice.[7]  The action plan comprises several preventive and mitigation measures, including the following:

**Screening of Inmates and Staff:** All new BOP inmates are administered an approved viral PCR test for COVID-19, and screened for symptoms and risk of exposure. Inmates who test positive and/or are symptomatic will be placed immediately in medical isolation, where they will remain until they meet the CDC symptom or time-based release from isolation criteria. New inmates who test negative and are asymptomatic are placed in quarantine for 14 days, and are not released to general population unless they test negative and are asymptomatic.

**Contractor Access:** Contractor access to BOP facilities is restricted to only those performing essential services (including medical or mental health care) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization from the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

**Quarantine Logistics:** The action plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the screening protocol.

**Suspension of Social Visits and Tours:** BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. In order to ensure that familial

---

[6]    The BOP's Phase Nine Action Plan is available at: https://www.bop.gov/foia/docs//COVIDphase9_08052020.pdf (accessed August 27, 2020).

[7]    The Bureau of Prisons has extended and enhanced its modified operations plans since the onset of the novel coronavirus pandemic, and the government expects these efforts will continue in subsequent phases of the action plan.

relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the action plan is in effect.[8]

**Legal Access:** BOP facilities are accommodating telephone and video conferences to the extent possible. Facilities have been instructed that, consistent with standing guidance, legal visits should be accommodated upon request, based on local resources. During in-person visits, inmates and attorneys or other legal visitors should wear face coverings and perform hand hygiene before and after. BOP strongly recommends facilities use Plexiglas or similar barrier between the inmate and legal visitor, and practice social distancing in the absence of a barrier. Legal visitors are symptom and temperature screened upon entry, and documents are to be passed without physical contact. Tables, chairs, and other high-touch surfaces are to be disinfected between usages. Inmates in medical isolation for COVID-19 should not have in-person legal visits unless absolutely necessary, and inmates in quarantine should delay visits until after quarantine.

**Inmate Movement:** BOP is taking a number of steps to reduce the risk of COVID-19 exposure and transmission for inmates or staff during inmate movement. Inmates are to be tested for COVID-19 and quarantined for 14 days prior to any transportation. In moving inmates between institutions, BOP is working to avoid movement variables that increase the risk of COVID-19 exposure and transmission, including mandatory face coverings, avoiding multiple stops, and avoiding mixing between inmates being transported and other inmate groups. Inmates who have tested positive are not permitted to travel until they have met the CDC symptom or time-based criteria for release from isolation. Transferred inmates will undergo the same process as new intakes, including COVID-19 testing, screening, and temperature checks. Likewise, all official staff travel has been cancelled, as has most in-person staff training.

**Compliance Reviews:** BOP will be conducting unannounced site visits to ensure institution operations conform to ongoing COVID-19 mitigation guidance and the BOP action plan.

**Modified Operations:** Finally, the action plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.[9]

---

[8]    The Phase Ten Action Plan reinstated certain social visitation corresponding to conditions at correctional facilities.

[9]    Further details are available at bop.gov/coronavirus/covid19_status.jsp, and at the regularly updated resource page, bop.gov/coronavirus/.

The measures enumerated in the action plan, and the expansion of COVID-19 testing, are designed to sharply mitigate the risk of COVID-19 transmission into BOP facilities. As communicated to the government, BOP professionals will continue to monitor the path of the virus and adjust its practices as necessary to maintain the safety of BOP inmates. *See Raia*, 954 F.3d at 597 (Third Circuit taking note of the "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

Further, the legislature, Department of Justice and BOP have shown their commitment to protecting inmates in light of COVID-19. For instance, in response to the COVID-19 outbreak, Congress expanded the BOP's statutory authority to reduce sentences to home confinement. Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (Mar. 27, 2020) (allowing the BOP to "lengthen the maximum amount of time the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2)). Continuing this trend, the Attorney General has ordered the BOP to broadly exercise its authority to reduce sentences to home confinement and protect inmates in BOP custody, taking into consideration inmates' ages, vulnerabilities to COVID-19, and other relevant factors. Attorney General, Mem. for Dir. of BOP, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020) (directing BOP to maximize prisoner transfers to home confinement at FCI Oakdale, FCI Danbury, FCI Elkton and other facilities whose operations BOP determines are materially affected by the virus); Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020). In other words, by policy, regulation, statute, and order from the Attorney General, the BOP is taking seriously the need to protect inmates from this very serious virus.

Finally, BOP has made significant progress in distributing and administering COVID-19 vaccines.  By early February 2021, vaccine doses had been delivered to every BOP institution. BOP first offered the vaccine to full-time staff members, who present the most likely vector for introduction of COVID-19 into a facility.  Vaccines now have been administered to all willing staff members, and BOP continues to encourage staff who have not accepted a vaccine to do so. At the same time, BOP has begun offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines.  BOP currently expects to offer a vaccine to every inmate in its custody by late May 2021.  As of October 11, 2021, BOP has administered 230,833 doses of the COVID-19 vaccine to inmates and staff.[10]

### H. Vaccinations

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available.  As of the week of February 8, 2021, doses of the vaccine had been delivered to every BOP institution.

BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. As of this time, vaccines have been administered to all willing staff members, and BOP continues to encourage staff members who have not accepted a vaccine to do so. (Staff members may also obtain and have obtained vaccinations from other providers in the community.)

---

[10]  Information on BOP's vaccination efforts, including the number of inmates vaccinated at particular facilities, is available at https://www.bop.gov/coronavirus/index.jsp (last accessed October 11, 2021).  The clinical guidance provided to BOP health service professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf (last accessed April 5, 2021).

BOP is now in the process of offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines.  In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates.  As of this time, BOP has administered a total of 230,833 doses to staff and inmates nationwide.  As of mid-April 2021, BOP estimated that if it continued to receive doses at the then-current pace it will have offered a vaccine to every inmate in its custody by June 1, 2021. As a court recently observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

At Fairton FCI, where the defendant is held, BOP has fully vaccinated 160 staff members, and 883 inmates (which is more than the current inmate population, and does not account for those additional inmates who declined vaccination).

The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf.  The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## II. ANALYSIS

### A. Petitioner has no medical conditions that can establish extraordinary and compelling reasons for compassionate release.

The analysis under the first prong of this multi-part inquiry is heavily guided by the CDC's published risk factors for incurring a severe, life-threatening case of COVID-19.  On March 29,

2021, the CDC modified its framework for categorizing medical risk factors affecting the likelihood of severe outcomes from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed April 6, 2021) [hereinafter "CDC Risk Factors"]. Previously, the CDC presented lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. The Department of Justice had taken the position that inmates who <u>are</u> at increased risk due to their medical conditions can show an "extraordinary and compelling" reason for compassionate release under U.S.S.G. § 1B1.13 app. note 1(A) – Medical Condition of the Defendant.

Now, the CDC describes most of the same risk factors (including those previously listed under the "might" category) as conditions that "can make you more likely to get severely ill." Although the revised CDC guidelines are more equivocal about what actually constitutes risk, the government has modified its position at this time to acknowledge that during the current COVID-19 pandemic, an inmate who has not been offered a vaccine and who presents one of the medical risk factors on the CDC list, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release. Such a condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the condition itself.

According to the CDC, those who "are more likely to become severely ill from COVID-19" are those who are:

- Pregnant

On the other hand, the following conditions "can make you more likely to get severely ill from COVID-19:"

- Cancer
- Chronic kidney disease
- Chronic lung disease (including COPD, moderate-to-severe asthma, interstitial ling disease, cystic fibrosis and pulmonary hypertension)
- Dementia
- Down Syndrome
- HIV infection
- Heart conditions, such as heart failure, coronary artery disease, "possibly" hypertension, or cardiomyopathies
- Immunocompromised state (weakened immune system)(list of conditions provided)
- Chronic liver disease
- Solid organ or blood stem cell transplant
- Being overweight and Obesity (Body Mass Index [BMI] >25 but <30kg/m2 for overweight; BMI >30 but <40kg/m2 for obesity, and BMI >40 for severe obesity.)
- Sickle cell disease and thalassemia
- Stroke or cerebrovascular disease, affecting blood flow to the brain
- Smoking, current or former
- Type 1 and Type 2 diabetes
- Substance use disorders, such as alcohol, opioid and cocaine disorder

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html [hereinafter "CDC Risk Factors"].  Accordingly, the government recognizes that inmates with the listed conditions have established threshold eligibility for compassionate release.

The CDC Guidelines also address the risk factors as they relate to the age of the person involved.  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.  "For example, people in their 50s are at higher risk for severe illness than people in their 40s.

26

Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older." *Id.* Petitioner is 50 years old, and not at severe risk due to her age.

Here, the defendant is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The motion should therefore be denied. *See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at \*2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at \*2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at \*1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at \*2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions).

Moreover, the defendant has received the Pfizer vaccine. Specifically, on August 16, 2021, BOP administered to the defendant the first dose of the COVID-19 vaccine produced by Pfizer. (Exh. 2 – Vaccine record.) The second dose will be administered shortly, if it has not been already. That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Smith*, 2021 WL 364636, at \*2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A).").

As a result, the defendant's motion for compassionate release should be denied. As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and

compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). The government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision.

That circumstance now does not exist in this case. The defendant has received a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was approximately 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19. *See* FDA Decision Memorandum, Moderna - Dec. 18, 2020, https://www.fda.gov/media/144673/download.

Various studies continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA. https://www.businesswire.com/news/home/20210401005365/en/.

The CDC likewise recently reported the effectiveness of the Pfizer and Moderna vaccines in preventing infection during the same period, and concluded that its extensive data "reinforce

28

CDC's recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is recommended for all eligible persons . . . ." "Interim Estimates of Vaccine Effectiveness," https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021).

Thus, the defendant has provided effective "self-care" against the virus, and does not present any extraordinary and compelling reason allowing compassionate release. As one court recently summarized:

> Here, Defendant is not at high risk of contracting severe COVID-19 because Defendant will have received both does of the Pfizer vaccine by the time he would be released. According to clinical trials published on the CDC's website, the Pfizer vaccine was 95% effective at preventing COVID-19 in people who did not have a previous infection. More importantly for purposes of this motion, clinical trials have shown that the Pfizer vaccine is 100% effective at preventing severe disease. Therefore, because Defendant will be at little-to-no risk of severe COVID-19 shortly after receiving his second Pfizer dose, there are no "extraordinary and compelling reasons" justifying a compassionate release in this case. *See United States v. Miller*, No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing that severe complications or death from COVID-19 is likely, or even possible, after an individual has received a full vaccination regimen. Over forty million individuals have been fully vaccinated in the United States, and the court does not know of a single confirmed death of a fully vaccinated individual from COVID-19.").

*United States v. Groom*, 2021 WL 1220225, at *2 (S.D. Ohio Apr. 1, 2021) (Sargus, J.).

Recent decisions overwhelmingly agree with this assessment. *See, e.g.*, *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021) (Logan, J.); *United States v. Godoy-Machuca*, 2021 WL 961780, at *2 (D. Ariz. Mar. 15, 2021) (Humetewa, J.) (defendant also recovered from COVID-19, providing an additional measure of protection); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (Sabraw, C.J.) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated against COVID-19); *United States v. Poupart*, 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021) (Arterton, J.); *United States v. Shepard*, 2021 WL 848720, at *5 (D.D.C. Mar. 4, 2021) (Moss, J.); *United States v. Stewart*, 2021 WL 1011041, at *2 (D. Haw. Mar. 16,

2021) (Mollway, J.); *United States v. Decano*, 2021 WL 1095979, at *6 (D. Haw. Mar. 22, 2021) (Gillmor, J.); *United States v. Johnson*, 2021 WL 863754, at *2 (W.D. Ky. Mar. 8, 2021) (Russell, J.); *United States v. Jones*, 2021 WL 1172537, at *2 (E.D. La. Mar. 29, 2021) (Barbier, J.); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021) (Gallagher, J.); *United States v. Gabbard*, 2021 WL 1037724, at *3 (E.D. Mich. Mar. 18, 2021) (Cox, J.); *United States v. Williams*, 2021 WL 1087692, at *3 (D. Minn. Mar. 22, 2021) (Frank, J.); *United States v. Burks*, 2021 WL 1291935, at *2 (D. Minn. Apr. 7, 2021) (Magnuson, J.); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021) (Reidinger, C.J.) (defendant presents obesity, diabetes, and hypertension, but he previously tested positive, and has received the first dose; "Because he has already contracted the virus and recovered without complication, and because he is in the process of being vaccinated, the Defendant cannot meet his burden of establishing that his COVID-19 risk is an extraordinary and compelling reason for his release."); *United States v. Williams*, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021) (Bell, J.); *United States v. Kosic*, 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021) (Crotty, J.) (also rejected other objections based on conditions at Fort Dix, where the inmate received the first dose of the Moderna vaccine, and also recovered from COVID-19); *United States v. Cardoza*, 2021 WL 932017, at *1 (D. Or. Mar. 11, 2021) (Jones, J.); *United States v. Roper*, 2021 WL 963583, at *4 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) ("The risk posed to an inoculated Mr. Roper is not an extraordinary and compelling reason for his release."); *United States v. Stiver*, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021) (Bissoon, J.); *United States v. Beltran*, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (Rainey, J.) (denying compassionate release to defendant with underlying health conditions when defendant had received first vaccine dose); *United States v. Ballenger*, 2021 WL 308814, at *4 (W.D. Wash. Jan. 29, 2021) (Settle, J.); *see also United States v. Lipscomb*, 2021 WL 734519,

at *2 (M.D. Fla. Feb. 25, 2021) (Chappell, J.) (inmate received both doses; "What's more, this demolishes Lipscomb's conclusory contention BOP is not taking adequate precautions. Currently, tens—if not hundreds—of millions of Americans are scurrying to figure out how to get a vaccine. Yet Lipscomb already received both doses. This does not suggest BOP is taking COVID-19 lightly or not protecting Lipscomb.").

Defendants have contested this consensus, pointing out that the vaccines may not be 100% effective, that they were not tested in a congregate setting, that they may not be effective for all individuals, and that variants may emerge that bypass the vaccines. These courts and others have almost uniformly rejected these arguments. One explained:

> Given that Rodriguez is or will soon be fully vaccinated against COVID-19, the Court concludes that Rodriguez's obesity and hypertension are not extraordinary and compelling reasons justifying his release. . . . Rodriguez argues that it is unclear how effective the Pfizer vaccine is, how long its effects will last, and whether it protects against the COVID variants, leaving a risk that he could still become seriously ill. Although all evidence to date is that the Pfizer vaccine is very effective, no one claims that it is 100 percent effective, and thus there remains a small risk that Rodriguez could be infected by COVID-19 and become seriously ill from that infection. But every prisoner runs a small risk of lots of serious medical conditions (including COVID-19). The small risk that Rodriguez may contract COVID-19 and become seriously ill is simply too speculative to justify his release.

*United States v. Rodriguez*, 2021 WL 1187149, at *1-2 (D. Minn. Mar. 30, 2021) (Schlitz, J.). Accordingly, the prevailing view is that "absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.); *see also, e.g.*, *United States v. White*, 2021 WL 964050, at *2 (E.D. Mich. Mar. 15, 2021) (Levy, J.) (denied after first dose, and rejects speculation regarding future effectiveness against variants: "Defendant is free to renew his motion should more information emerge suggesting that the Pfizer vaccine cannot protect him from new imminent strains of COVID-19. However, at this time, the Court does not find extraordinary and

compelling circumstances based on that speculation."); *United States v. Kariblghossian*, 2021 WL 1200181, at *3 (C.D. Cal. Mar. 29, 2021) (Snyder, J.) ("Nonetheless, at this time, the available scientific evidence suggests that the Pfizer vaccine is highly effective against known variants of the SARS-COV-2 virus that causes COVID-19) (citing CDC studies and Yang Liu, et. al., Neutralizing Activity of BNT162b2-Elicited Serum, The New England Journal of Medicine (March 8, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2102017?query=featured_home)); *United States v. Goston*, 2021 WL 872215, at *3 (E.D. Mich. Mar. 9, 2021) (Levy, J.) (finding the potential that the Pfizer vaccine does not protect against variants inadequate to justify release); *United States v. Brown*, 2021 WL 1154207, at *3 (S.D.N.Y. Mar. 26, 2021) (Wood, J.) (speculation about variants is insufficient); *United States v. Del Rosario Martinez*, 2021 WL 956158, at *3 n.10 (S.D. Cal. Mar. 10, 2021) (Anello, J.) (declining to rely on a frequently submitted declaration of Dr. Tara Vijayan, stating, "with all due respect to Dr. Vijayan's expertise and experience, the Court declines to contribute in any fashion to public skepticism regarding the safety and efficacy of the available COVID-19 vaccines or to second-guess the Food and Drug Administration's findings and decision to issue Emergency Use Authorizations for COVID-19 vaccines 'for which there is adequate manufacturing information to ensure its quality and consistency.' The Path for a COVID-19 Vaccine from Research to Emergency Use Authorization, available at www.FDA.gov/COVID19vaccines#FDAVaccineFacts (last visited 3/9/2021).").

It is possible that the scientific consensus may shift dramatically if vaccine-resistant variants emerge or the vaccines prove less efficacious than studies to date suggest. If those possibilities materialize, nothing would prevent the defendant from filing another motion for compassionate release. *United States v. Singh*, 2021 WL 928740, at *3-4 (M.D. Pa. Mar. 11, 2021)

(Brann, J.) ("Indeed, the majority of CDC recommendations for fully vaccinated people indicate that the CDC's primary concern is not with fully vaccinated individuals being hospitalized due to COVID-19, but with such individuals potentially spreading the virus to unvaccinated individuals. . . . It is, of course, possible that future research will demonstrate that current, or future, COVID-19 variants mitigate the effectiveness of the Moderna vaccine to such an extent that the vaccine no longer provides individuals with effective protection. However, Singh has not demonstrated that such is the case today and, it bears emphasizing, the burden falls upon Singh to demonstrate that compassionate release is warranted.").

At this time, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus. As inmates are vaccinated, this unprecedented period, in which the threat of the virus sometimes gives rise to "extraordinary and compelling" circumstances, should come to an end, and sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (Failla, J.) ("a defendant's medical condition must be one of substantial severity and irremediability."); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (Pepper, J.) (must be extraordinary; "Many inmates suffer from pain and mental illness."). At present, the defendant does not present any such condition.

For all of these reasons, compassionate release is not warranted here. Further, even if the defendant were at elevated medical risk, relief should be denied.  This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

At present, these considerations – including the defendant's risk of danger to the community, his vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19 – counsel strongly against relief.

**B. Petitioner's thirty-year sentence does not present an extraordinary and compelling reason for compassionate release.**

Petitioner also asks the Court to grant compassionate release based on the disparity between his sentence and others that he claims were similarly situated.  Motion at 15-19.  The government respectfully submits that these allegations are insufficient to satisfy the substantial burden of showing extraordinary and compelling circumstances for the rare and extraordinary remedy of compassionate release.

As discussed above, it is the government's position that the Commission's Policy Statement is binding on the courts. The government recognizes, however, that in its recent decision in *United States v. McCoy*, the Fourth Circuit held otherwise. In *McCoy*, the Fourth Circuit held that "[t]here is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284.[11] The Court also held that the "Other Reasons" category at Application Note 1(D) is not limited to other reasons identified by the BOP. *Id.*

The *McCoy* Court acknowledged that the United States Sentencing Commission is the entity which Congress empowered to define extraordinary and compelling reasons. *Id.* at 284 (citing 28 U.S.C. § 944(t) as instructing the Commission, in promulgating general policy statements regarding § 3582(c)(1)(A), to "describe what should be considered extraordinary and compelling reasons" for sentence reductions). But the Court nonetheless ruled that "where the Commission fails to act,[12] then courts make their own independent determinations of what constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A)." *Id.*

---

[11] As explained above, the government maintains its position that the Commission's Policy Statement is binding on the courts, and that *McCoy* was wrongly decided. The Solicitor General's Office is currently deciding whether to challenge the decision by a petition for writ of certiorari in the Supreme Court.

[12] The *McCoy* Court refers to the fact that the Sentencing Commission has not revised the U.S.S.G. § 1B1.13 policy statement since the First Step Act was enacted, and acknowledges that the Commission could not do so because it "currently lacks the quorum required to amend the Sentencing Guidelines." *McCoy*, 981 F.3d at 282 n. 6. In order to achieve a quorum, members of the Commission must be appointed by the President and confirmed by the Senate. *See* https://www.ussc.gov/about/who-we-are/organization.

Even adopting *McCoy's* holding – which the government maintains is contrary to the law – the mere fact that Petitioner asserts that there is a disparity between the sentence he is currently serving and the sentence others have received does not constitute extraordinary and compelling reasons for compassionate release. Any court that relies on *McCoy* in considering a request for compassionate release should not find that its holding applies indiscriminately to any claim of an alleged sentencing disparity. The *McCoy* decision was not so broad as to allow that. In fact, such a broad application of extraordinary and compelling reasons would unleash the very "Wild West" scenario that Judge Easterbrook of the Seventh Circuit decried in his recent holding in *United States v. Gunn*:

> [W]e do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy … The statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive. *Cf. Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).

*United States v. Gunn*, 980 F3d 1178, 1180 (7th Cir. 2020).

Moreover, courts should not apply *McCoy* across the board to every case involving an alleged sentencing disparity. This was not the intent of the Fourth Circuit in *McCoy*, nor a reasonable reading of the Policy Statement definition of "other" extraordinary and compelling reasons, § 1B1.13(D), even assuming *McCoy* was decided correctly. *See McCoy*, 981 F.3d at 287 (supporting only "the provision of individual relief in the most grievous cases" but not "automatic vacatur and resentencing of an entire class of sentences"). Reading *McCoy* so broadly subverts the entire foundation for the well-grounded concept of the finality of sentencing. *Goodwyn*, 596

36

F.3d at 235 ("The law closely guards the finality of criminal sentences against judicial change of heart") (internal quotation omitted).  It stands to unleash the "avalanche of applications" that *McCoy* expressly rejected.  *McCoy*, 981 F.3d at 286-87.

Rather, any court that adopts *McCoy* should limit its application to the narrow circumstances it presented – specifically an extraordinarily long sentence resulting from numerous "stacked" § 924(c) convictions that could not have occurred after the First Step Act.[13]  Moreover, the *McCoy* Court and the district courts below all considered multiple factors in determining that the individuals in those consolidated appeals each presented extraordinary and compelling reasons for compassionate release.  *See McCoy*, 981 F.3d at 288.  In finding that the district courts appropriately exercised their discretion, the Court explained:

> The courts took seriously the requirement that they conduct individualized inquiries, basing relief not only on the First Step Act's change to sentencing law under § 924(c) but also on such factors as the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served.

*Id*.  The Court also noted that, in the three consolidated appeals that comprised *United States v. Bryant*, "defendants Keith Bryant, Kittrell Decator, and Craig Scott participated in one attempted and two completed bank robberies, *none of which resulted in any injuries*."  *Id*. at 278 (emphasis added).  And the Court took account of each defendant's "minimal criminal history at the time of his offenses."  *Id*. at 279.

---

[13]    Section 403 of the First Step Act changed the practice of "stacking" § 924(c) sentences by clarifying that the 25-year mandatory minimum for "second or subsequent" § 924(c) convictions applies only when a prior § 924(c) conviction arises from a separate case and already "has become final," rather than applying to multiple § 924(c) convictions obtained in a single prosecution.  *McCoy*, 981 F.3d at 275.  *See also United States v. Jordan*, 952 F.3d 160, 171 (4th Cir. 2020) (the 25-year mandatory minimum is now "reserved for recidivist offenders").

Even applying *McCoy* here – over the government's objection – Petitioner still does not meet the substantial burden of showing that extraordinary and compelling circumstances exist for the granting of the rare and extraordinary remedy of compassionate release.  He was not subject to the "stacking" of multiple § 924(c) convictions.  In fact, he was not subject to <u>any</u> sentencing law that was modified by the First Step Act.[14]

In addition, Petitioner has also not exhibited "exemplary" post-conviction conduct, as he has four disciplinary infractions.  *See* Exhibit 3 – BOP Disciplinary Record.

Petitioner essentially claims that he is entitled to a sentence reduction because other individuals in separate cases have received shorter sentences where they were involved in a murder.  Motion at 15-19.  His identification of others who received lesser sentences ignores the numerous individuals who have received comparable sentences.  As an initial matter, his codefendant Holness received a life sentence.  In addition, in the following cases the defendants pled guilty to murder and were sentenced to 30 years or substantially more:

- *United States v. Gregory Whisonant, et al.*, ELH-17-0191

    - *Aaron Daniels* – Defendant was sentenced to **40 years** after pleading guilty to § 924(j) murder of Donya Rigby, an underling in the street-level drug trafficking organization of which he was a member.

    - *Nathaniel Hillard* – Defendant was sentenced to **35 years** after pleading guilty to § 924(j) murder of Donya Rigby, an underling in the street-level drug trafficking organization of which he was a member—*despite the fact that he served as a "lookout" for the murder and was not the trigger-puller.*

    - *Gregory Whisonant* – Defendant was sentenced to **30 years** after pleading guilty to

---

[14]    Section 401 of the First Step Act modified the application of sentence enhancements under 21 U.S.C. §§ 841 and 851.  *See United States v. Thomas*, 810 F. App'x 207, 208 (4th Cir. 2020).  Section 404 made the 2010 Fair Sentencing Act's modifications to the statutory penalties for cocaine base offenses at § 841(a) retroactive.  *United States v. Wirsing*, 943 F.3d 175, 176 (4th Cir. 2019).

drug trafficking conspiracy and admitting to supervising street-level drug trafficking organization of which Aaron Daniels and Nathaniel Hillard were members—*despite the fact that he was not involved in the murder of Donya Rigby*.

- *United States v. Marlon Cruz-Flores*, JKB-17-0589 – Defendant was sentenced to **38 years** after pleading guilty to RICO conspiracy and admitting to participating in the murder of a rival gang member and attempted murder of two others—*despite the fact that he was not convicted of a substantive murder count.*

- *United States v. Davon Martin*, GLR-13-0677 – Defendant was sentenced to **35 years** after pleading guilty to RICO conspiracy and admitting to committing retaliatory murders of two rival gang members who had shot at him and killed an associate of his—*despite the fact that he was not convicted of a substantive murder count.*

- *United States v. Taylor Pepe*, GLR-15-0020 – Defendant was sentenced to **35 years** after pleading guilty to Hobbs Act robbery conspiracy and admitting to participating in failed robbery and murder of drug dealer—*despite the fact that he was not the shooter and was not convicted of a substantive murder count.*

- *United States v. Anthony Nelson*, AW-10-0048 – Defendant was sentenced to **50 years** after pleading guilty to bank robbery and § 924(c) and admitting to participating in bank robbery, during the course of which he shot and killed the getaway driver.

- *United States v. Perry Roark*, RDB-11-0547 – Defendant was sentenced to **life** after pleading guilty to RICO conspiracy and admitting to leading Dead Man Incorporated (DMI) prison gang, during the course of which he ordered two murders that were carried out by other members of the gang, two murders that were never carried out, as well as other assaults.

- *United States v. Jose Salmeron-Larios, et al.*, PX-16-0444

  - *Oscar Delgado-Perez*, PX-16-0444 – Defendant was sentenced to **35 years** after pleading guilty to RICO conspiracy and admitting to participating in the murder of a rival gang member—*despite the fact that he was not convicted of a substantive murder count.*

  - *Noe Coreas-Mejia*, PX-16-0444 – Defendant was sentenced to **33 years** after pleading guilty to RICO conspiracy and admitting to participating in the murder of a rival gang member—*despite the fact that he was not convicted of a substantive murder count.*

  - *Kevin Henriquez-Chavez*, PX-16-0444 – Defendant was sentenced to **30 years** after pleading guilty to RICO conspiracy and § 924(o) and admitting to ordering the murder of a rival gang member, which was carried out by other members of the gang—*despite the fact that he was not present for the murder and was not convicted of a substantive murder count.*

- *United States v. Davon Sanford*, CCB-15-0550 – Defendant was sentenced to **30 years** after pleading guilty to § 924(j) murder and admitting to carrying out contract killing.

- *United States v. Daniel Flores-Ventura, et al.*, JKB-18-0070

    o *Daniel Flores-Ventura* – Defendant was sentenced to **30 years** after pleading guilty to RICO conspiracy and admitting to participating in murder of rival gang member—*despite the fact that he was not convicted of a substantive murder count.*

    o *Wilians Lovos-Ayala* – Defendant was sentenced to **30 years** after pleading guilty to RICO conspiracy and admitting to participating in murder of rival gang member—*despite the fact that he was not convicted of a substantive murder count.*

- *United States v. Elmin Portillo-Guiterrez, et al.*, JKB-16-0259

    o *Carlos Alas Brizuela* – Defendant was sentenced to **32 years** after pleading guilty to RICO conspiracy and admitting to ordering the murders of two rival gang members, and personally murdering a third rival gang member—*despite the fact that he was not convicted of a substantive murder count.*

    o *Albaro Rosa-Moreno* – Defendant was sentenced to **30 years** after pleading guilty to RICO conspiracy and admitting to participating in the murders of two rival gang members—*despite the fact that he was not convicted of a substantive murder count.*

- *United States v. Stanislav Yelizarov*, MJG-16-0309 – Defendant was sentenced to a total of **50 years** for 2009 murder and 2013 robbery and kidnapping conspiracy.

In theory, this would set up a petitioner like this one to seek compassionate release any time another defendant involved in a similar crime received a more lenient sentence.  Such an intellectually-unbounded justification likely would circumvent the law in some instances (e.g., offering the benefit of a non-retroactive change applicable to one defendant retroactively to another through the compassionate release doorway).  Not only would that require district courts to entertain an endless docket of compassionate release motions, but it would eviscerate the command of sentence finality.

Such situations certainly could not have been the intent of this Circuit in *McCoy*, nor a reasonable reading of the Policy Statement definition of "other" extraordinary and compelling

reasons, § 1B1.13(D), even assuming *McCoy* was decided correctly. It is also worth noting that defendants who now obtain relief under *McCoy* will have received a benefit that would be unavailable to others were *McCoy* to be overturned, which would result in a gross sentencing disparity for those who do not benefit. Moreover, if the U.S. Sentencing Commission promulgates a new policy statement – as indeed it must – that does not conform to the principle in *McCoy*, future petitioners would suffer the same disparity. While we do not concede that *McCoy* was decided correctly, and we note our objections for purposes of any subsequent appeal in this case or others, based on the foregoing, we believe the *McCoy* decision nevertheless should not result in a grant of Petitioner's compassionate release.

In any event, the original court found at sentencing that Petitioner's original 30-year sentence to be the correct one, taking all relevant factors into account. In addition to those discussed above, the Court also considered the fact that Petitioner pled after his co-defendant had been convicted at trial (and received a life sentence) and therefore was differently situated from his co-defendants because he had not yet been identified at the time of trial. This Court should not rethink the original sentencing court's decision.

This Court should decline to extend the *McCoy* decision to such circumstances, and should find that Petitioner has not established extraordinary and compelling reasons for compassionate release.

**C. The factors set forth in 18 U.S.C. § 3553(a) further support a denial of the requested relief.**

Petitioner's motion should also be denied after consideration of the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes described in § 3553(a)(2):

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).  In imposing the sentence, the court shall consider *inter alia* "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).[15]

Here, the seriousness of the instant offense weighs against reducing Petitioner's sentence. As discussed above, Petitioner was an integral part of a complex scheme to brutally murder an innocent 27-year old woman.  His involvement required significant advance planning so that he could travel from Georgia to New York and so that he could get back to Georgia undetected.  At many points during that time – while he was discussing this with Holness, while he was traveling to New York, while he was in the car with the victim for several hours before the murder – he could have decided not to play a part in her murder.  Instead, he provided – by leaving his blood in the vehicle and driving the vehicle to be obviously abandoned many miles away – vital corroboration for Holness's story that he and the victim had been car jacked.  Even if he did not participate in stabbing the victim, without Petitioner's contribution, the victim might still be alive.

---

[15]    Additionally, the Court may consider an eligible defendant's post-sentencing conduct in determining whether relief is appropriate.  *See Pepper v. United States*, 562 U.S. 476 (2011).

This crime has also had a significant impact on the victim's family. *See* Exhibit 4 & 5 – Victim Impact Statements. The victim had a young son. *Id.* Because of the actions of Holness, and the active assistance of Petitioner, he will never know his mother.

For the same reasons that highlight the seriousness of the offense, there is also a need for a significant deterrent to others contemplating similar situations. That weights against a reduction in sentence. Further, the history and characteristics of the Petitioner also weigh against a reduction of sentence. Petitioner's criminal history is not substantial, but he does have prior convictions for Drunk Driving (2005) and Simple Battery/Family Violence (2009). PSR ¶¶ 41-42. Moreover, even these convictions reflect a series of subsequent violations. *Id.* In addition, the defendant has had a number of disciplinary issues while at BOP, which indicate his inability to rehabilitate himself. Exh. 3.

A sentence must, *inter alia*, reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes. 18 U.S.C. § 3553(a)(2). The facts above support the government's position that Petitioner's current 360-months sentence is the correct sentence pursuant to the factors set forth in 18 U.S.C. § 3553(a), and should remain undisturbed. This Court should not rethink the sentencing court's decision. *See Goodwyn*, 596 F.3d at 235 ("The law closely guards the finality of criminal sentences against judicial change of heart").

Accordingly, for all the reasons discussed herein, this Court should find that Petitioner is ineligible for a sentence reduction, or that alternatively, it is unwarranted under the § 3553(a) factors. *See, e.g.*, *United States v. Kevin Walker*, DKC-11-686, 2020 WL 4227196 (D. Md. July 23, 2020) (denying compassionate release to 50-year-old inmate who had asthma, type 2 diabetes, hypertension, obesity, hyperlipidemia, hypothyroidism, and low IQ); *United States v. Gallman*,

PWG-14-292, 2020 WL 3412995 (D. Md. June 22, 2020) (finding that inmate remained an economic danger to the community and denying compassionate release to tax protestor who had "immunocompromised status due to a kidney transplant" that placed "him at heightened risk for severe complications if he were to contract the disease"); *Barringer*, 2020 WL 2557035, at *7-9 (denying compassionate release for 60 year old white-collar inmate who suffers from "hypertension, diabetes, a chronic kidney disease, and extreme obesity (over 400 pounds)," and who served 50 percent of his sentence); *Wright*, 2020 WL 2571198 (denying compassionate release motion for inmate who is "66 years old, has a body mass index over 50, and has a variety of medical conditions, including diabetes, hypertension (high blood pressure), chronic kidney disease, and asthma"). "Simply put, the coronavirus is not tantamount to a 'get out of jail free' card." *See Hiller*, 2020 WL 2041673, at *4.

## CONCLUSION

Based upon the foregoing, Petitioner's request should be denied because he has not shown an "extraordinary and compelling reason" for compassionate release, as defined by U.S.S.G. § 1B1.13, nor is release merited under the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted.

Erek L. Barron
United States Attorney

/s/_____
Kenneth S. Clark
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing was sent on October 12, 2021,

to the defendant:

DELLANDO RECARDO CAMPBELL
Register Number: 71279-097
FCI FAIRTON
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 420
FAIRTON, NJ  08320

_____/s/_____
Kenneth S. Clark