UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,
Plaintiff,

v.                                        Case No.: 1:14-cr-00058-ELH

DELLANDO RECARDO CAMPBELL,
Defendant.

---

MOTION FOR SENTENCE REDUCTION UNDER
18 U.S.C. §3582(c)(1)(A) (Compassionate Release)

---

Comes now Defendant, Dellando Recardo Campbell, pro se, and respectfully requests this Honorable Court modify his sentence pursuant to 18 U.S.C. §3582(c)(1)(A) to a lower term, time served or, alternatively, immediate release to probation and as grounds therefore sets forth as follows:

JURISDICTION

This Court has jurisdiction over this matter pursuant to 18 U.S.C. §1331 and §3582.

PROCEDURAL HISTORY

On February 4, 2014, Mr. Campbell was charged in a one-count indictment with having "traveled in interstate commerce with the intent to kill and injure" the spouse of Ryan Holness, resulting in a crime of violence against that spouse, i.e., the commission of murder as defined in 18 U.S.C. §1111(a), in violation of 18 U.S.C. §2261(a)(1) and (b)(1).  Mr. Campbell entered a plea of guilty before Judge William Nickerson on July 28, 2014.  Pursuant to the plea agreement, the plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 360 months (30 years).

Sentencing was held on November 5, 2014.  Mr. Campbell was

-1-

31-years-old at the time of sentencing. Pursuant to the Amended Presentence Report, Mr. Campbell had a final offense level of 41 under the U.S. Sentencing Guidelines. The PSR noted that Mr. Campbell had a criminal history category of III. However, the judge reduced it to II based on over-representation. This change did not affect the calculation of the Guidelines, The offense carried a maximum term of life imprisonment. The Guidelines called for a period of incarceration from 360-months to life. In accordance with the 11(c)(1)(C) plea, Mr. Campbell was sentenced to 360 months imprisonment.

Mr. Campbell has filed a previous motion for compassionate release on July 20, 2021. In his original motion, Mr. Campbell laid out his exceptional record of rehabilitation, his remarkable behavior while in custody, the sentence disparity that exists among similarly situated defendants, the unusually lengthy sentence imposed, and, in light of COVID-19, the harsh prison conditions and the impact upon his health due to his ongoing medical conditions. In this motion for compassionate release, Mr. Campbell raises many of the same issues, however, he provides new evidence to support his request including his worsening medical conditions to support his request for relief.

LEGAL STANDARD

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. §3582(c); see United States v. Hargrove, 30 F.4th 189, 194 (4th Cir. 2022); United States v. Chambers, 956 F.3d 667, 671 (4th Cir. 2020); United States v. Jackson, 916 F.3d 492, 495 (4th Cir. 2020); United States v. Martin, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality

-2-

is subject to a few narrow exceptions." Freeman v. United States, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. §3582 (c)(1)(B); see Jackson, 592 F.3d at 495.

The "compassionate release" provision of 18 U.S.C. §3582(c) (1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. §3582(c)(A)(i); see Hargrove, 30 F.4th at 194. This statutory provision is an exception to the ordinary rule of finality. United States v. Jenkins, 22 F.4th 162, 169 (4th Cir. 2021).

The First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018);  see, United States v. McCoy, 981 F.3d 271, 275-76 (4th Cir. 2020), permits a court to reduce a defendant's term of imprisonment" upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on defendant's behalf or the lapse of 30 days from receipt of such a request by the warden of the defendant's facility," whichever occurs first.  Thus a defendant may proceed to court after 30 days have passed from the date when the warden received the defendant's request.  Jenkins,  22 F.4th at 169; United States v. Muhammad, 16 F.4th 126, 129 (4th Cir. 2021); McCoy, 981 F.3rd at 276.

In order to be entitled to relief under §3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing Commission; and (3) on balance, the factors

-3-

set forth in 18 U.S.C. §3553(a) warrant a reduction of sentence.

When a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions.  18 U.S.C. §3582(c)(1)(A).  In relevant part, the Policy Statement provides six circumstances that, individually or in combination, may provide "extraordianry and compelling reasons" for a reduction of sentence.  Pursuant to U.S.S.G. §1B1.13(b)(6), that can include a defendant who received an "unusually long sentence" and has served at least 10 years of that sentence.

The factors enumerated in 18 U.S.C. §3553(a) include (1) the nature and circumstances of the offense and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to adequately deter criminal conduct, to provide the defendant with the needed educational or vocational training and treatment, and to  protect the public; (3) the kinds of sentences available; (4) the Sentencing Guidelines range and the statutory minimum and maximum; and (5) the need to avoid sentencing disparities between similarly situated defendants.

COVID-19

COVID-19 was declared a global pandemic by the World Health Organization on March 11, 2020.  In 2022, COVID-19 was the fourth-leading cause of death following heart disease, cancer, and unintentional injury.  As of February 2024, there have been more than 774,000,000 confirmed cases and 7,000,000 deaths globally. The virus has continued to evolve and has not yet settled into a predictable pattern.  COVID-19 will continue to evolve and a new variant could emerge that is more infectious and causes more

severe symptoms.  COVID-19 is highly contagious.  Since the onset of the disease, masking, separating, and social distancing were nascent.

The recommendations such as social distancing and rigorous persoanl hygiene that are important factors in preventing the spead of COVID-19 are unavailable to those in penal settings. Inmates are unable to procure such items as hand sanitizers and disposable masks to protect themselves from the transfer of the virus.  Nor are inmates able to socially distance themselves from others to include guards and staff who bring COVID-19 into the prison setting.  Prisoners eat in a common area, share restrooms, share laundry, and share cells with other inmates with no ability to avoid these settings.  The changes implemented by the BOP to combat COVID-19 have been relaxed since September 2022 when on the CBS show 60 Minutes President Biden declared that the pandemic was over.

Despite Prsident Biden's optimism, COVID-19 remains prevelant in the United States.  Unfortunately, the tracking of COVID-19 has been diminished as government support of the agencies responsible for monitoring COVID-19 have been substantially reduced. As of July 18, 2024, a new summer COVID-19 wave had emerged leading coronavirus activity in wastewater to reach levels considered high or very high in 26 states.  Even President Biden was infected by this recent wave of COVID-19.

The Centers for Disease Control and Prevention ("CDC") has provided an ever-evolving set of risk factors that pose a greater risk of severe illness, and even death due to COVID-19.  The most recent update was in May 2023.  According to the CDC, the factors that increase the risk of severe illness include that

-5-

are relevant in this matter specifically are chronic lung disease such as asthma, hypertension, and mental health conditions. People suffering from these ailments face increased risk for severe illness and even death from COVID-19. Currently, no cure exists for COVID-19. A vaccine has been developed; but the vaccine is primarily beneficial in easing the severity of COVID-19 symptoms. The best chance for survival from COVID-19 is not to catch it in the first place. However, as mentioned earlier, penal institutions are not the environment in which to avoid COVID-19.

Mr. Campbell has been diagnosed with hypertension, PTSD, and he is being evaluated for asthma due to shortness of breath and difficulty breathing. Mr. Campbell's hypertension is being treated with medication, however, the medication is not helping his symtoms. Mr. Campbell's dosage of hypertension medication was increased recently; but the increase has not resulted in a change in his hypertension. Mr. Campbell has been diagnosed with PTSD, a mental health condition. His PTSD results from his childhood and from his military experiences. As noted above, mental health conditions result in increased risk for severe illness from COVID-19. Altogether, Mr. Campbell suffers from three conditions that place him at high risk for severe illness and even death from COVID-19. Mr. Campbell's medical records from the BOP are included with this filing for the Court's review. Since President Biden announced the end of the pandemic, the BOP has stopped testing for COVID-19, thus Mr. Campbell would not be aware if an outbreak of COVID-19 were to occur at his facility.

ADMINISTRATIVE REMEDY

This is Mr. Campbell's second motion for compassionate release. He has submitted a letter to the Warden of FCI Englewood

-6-

and over 30-days have passed without a response. Therefore, Mr. Campbell is proceeding with this petition for compassionate relief as he has satisfied the administrative procedure requirement.

MR. CAMPBELL'S BACKGROUND

Mr. Campbell was born October 30, 1982 in Kingston, Jamaica. His upbringing was marked by exposure to the violence in the community in which he was raised. Mr. Campbell worked hard to keep himself apart from the violence and from following in the footsteps of many of the young men in his community. In the attached letters of support from friends and family, Mr. Campbell's efforts to set himself apart and to counsel others to improve themselves are highlighted.

In December 2000, Mr. Campbell moved to East Orange, New Jersey. In March 2001, he joined the Navy, only three-months after his arrival in the United States. Mr. Campbell was an Aviation Ordinanceman who earned promotions from E-1 to E-4 during his time in the Navy. He served in the Iraqi War and participated in a humanitarian relief expedition to Somalia while in the Navy. He was awarded an Iraqi participation medal, a combat veteran award for his involvement in the Iraqi War, and a humanitarian award for his efforts on the Somalian relief expedition. After serving his four-year contract, Mr. Campbell was honorably discharged from the Navy.

After his discharge from the Navy, Mr. Campbell maintained fulltime employment. He worked as a warehouse supervisor for an animal feed manufacturing plant for two years. Mr. Campbell then worked for Del Monte as a warehouse supervisor at the food distribution warehouse for three years. It was while working

-7-

for Del Monte that Mr. Campbell committed the crime that resulted in his current incarceration. After leaving Del Monte, Mr. Campbell was in charge of in-house auditing and inventory for a wine company in New Jersey. Mr. Campbell maintained fulltime employment since leaving the Navy and worked in management positions. His work history is exemplary and he has skill sets that will easily allow him to find employment in today's workforce.

That Mr. Campbell was caught up in the crime that resulted in his incarceration was a shock to his family and friends. Even the sentencing court commented on Mr. Campbell's exemplary life prior to the indictment. Judge Nickerson stated he was "very, very shocked" when he took the time to "study [Mr. Campbell's] content of character" at the time of sentencing. But for that one fateful thinking error, Mr. Campbell would be continuing to live the stable and productive life he lived prior to the indictment. Mr. Campbell's background is a significant factor to consider upon resentencing.

UNWARRANTED SENTENCING DISPARITY

An additional factor to be considered when reviewing Mr. Campbell's request for compassionate release is the sentencing disparity between Mr. Campbell's sentence and the sentences of similarly-situated defendants. 18 U.S.C. §3553(A)(6) requires a district court to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conductand is aimed at eliminating national sentencing disparity. See United States v. Hernandez, 824 Fed. Appx. 159, 2020 U.S. App. LEXIS 26838(4th Cir. Aug. 24, 2020).

In United States v. Myers, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021) Judge Blake explained that a court evaluating a motion for sentence reduction based on a sentencing disparity should consider:

> (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is 'dramatically longer than necessary and fair,' (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in (2023 U.S. Dist. LEXIS 43) the BOP.

This Honorable Court has relied on statistics compiled by the United States Sentencing Guidelines Commission in cases involving compasssionate release in the past.  See United States v. Levi Johnson, 2023 U.S. Dist. LEXIS 193741, Crim. No. ELH-99-352 (D. Maryland Oct. 27, 2023).  When held up against the statistics for the fiscal year 2022, Mr. Campbell's sentence is substantially longer than the average sentence imposed for cases of murder.  In 2022, the average national sentence imposed for drug trafficking is 78 months (6 years, 6 months); for murder, 261 months (21 years, 9 months); for firearms, 49 months (4 years-one month); and for kidnapping, 184 months (15 years, 4 months).  Table 15, "Sentence Imposed by Type of Crime," at 64, in 2022 Annual Report and Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, https://perma.cc/JJ54-A9PC ("2022 Sourcebook").

Applying the analysis set forth by Judge Blake in the District of Maryland would result in a strong argument for reduction of sentence for Mr. Campbell.  First, Mr. Campbell's sentence

-9-

that was imposed in 2014 was at the bottom of the sentencing guidelines for his crime. Mr. Campbell's case proceeded quickly through the court--approximately six months--and he took the first plea agreement offered. Mr. Campbell provided little to no evidence in mitigation at sentencing, thus the court relied upon the PSR in following the plea agreement. Had Mr. Campbell been sentenced today, it is substantially likely that the court would have deviated from the advisory guidelines and taken into account all the §3553 factors that Mr. Campbell did not but should have presented in mitigation and offered a sentence more in line with sentences being passsed out for similarly-situated defendants. This leads directly to the second prong of the analysis that requires an evaluation of sentences imposed for similar or more serious offenses. Cases can be cited on both sides of the argument as to whether Mr. Campbell's sentence is unusually or grossly lengthy in relationship to comparable or more serious cases. What is more relevant is the statistic that the fiscal year of 2022 resulted in an average national sentence of 261 months (21 years, 9 months) for murder. Here, Mr. Campbell did not commit the act of murder, yet he still received a sentence substantially greater than the average sentence for murder.

As for the third prong of the analysis, Mr. Campbell has served over 11 years of his 30-year sentence. He is not asking for immediate release; but rather a sentence that more accurately reflects his role in the crime. Arguably, had Mr. Campbell been convicted of murder in 2022, he would be serving a sentence closer to 20 years. Mr. Campbell was not convicted of murder, yet he was sentenced to a term of imprisonment that is unusually or grossly lengthy to sentences currently imposed for similar or

more serious offenses. The final prong of the analysis requires a review of the personal characteristics of the defendant. This review is to include the defendant's background, his age at the time of the offense, and his post-sentencing conduct. These characteristics will be further explored in this motion under the 18 U.S.C. §3553 analysis.

In summation of the sentence disparity argument, Mr. Campbell meets the criteria for a sentence reduction pursuant to the results of the analysis as set forth for the District of Maryland. Mr. Campbell's sentence is dramatically longer than necessary when compared to the national standard sentence for murder in 2022. His sentence is significantly longer than that of similarly situated defendants or those sentenced of more serious crimes. He has already served a substantial portion of his sentence if his sentence reflected his role in the crime and the average sentence for such a role. Mr. Campbell's personal characteristics both pre-and-post sentencing support a sentence reduction. Finally, Mr. Campbell argues that the sentence disparity alone in his case provides the court with sufficient evidence to find he has met the standard of extraordinary and compelling circumstances.

## 18 U.S.C. §3553 ANALYSIS

Once a defendant establishes extraordinary and compelling reasons to render him eligible for a sentence reduction, the court must consider factors under 18 U.S.C. §3582(a) to determine whether, in its discretion, a reduction of sentence is appropriate. See Dillon v. United States, 560 U.S. 815, 826-27, 103 S.Ct. 2683, 177 L.Ed. 271 (2010). A district court enjoys broad discretion in conducting this analysis. United States v. Trotman,

-11-

829 F. App'x 607, 608 (4th Cir. 2020)(per curium), recognizing that when considering a motion to reduce a sentence under §3582 (c)(1)(A), the court must consider the sentencing factors under §3553(a), to the extent applicable.  Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post- sentencing developments." United States v. Mangarella, 57 4th 197 203 (4th Cir. 2023).  Pursuant to Pepper v. United States, 562 U.S. 476, 131 S.Ct. 1229, 179 L.Ed. 196, 2011 US LEXIS 1902, Cogress could not have been clearer in directing that no limitation be placed on information concerning the background, character, and conduct of a defendant may receive and consider for the purpose of imposing an appropriate sentence.

When a defendant's sentence has been set aside, a district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation and that evidence, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guideline Range.  Further, when rehabilitation is combined with other factors--such as COVID-19--the standard of extraordianry and compelling circumstances can be met.  This further supports that Mr. Campbell has cleared the hurdle of extraordinary and compelling circumstances and that the evidence he presents support a downward variance from the Federal Sentencing Guidelines Range.

One of the factors the court can consider is Mr. Campbell's background and conduct prior to his offense.  As pointed out earlier in this motion, Mr. Campbell's conduct prior to the immediate offense was exemplary.  He was a role model to family and peers in his life growing up in Kingston, Jamaica, where he set

-12-

an example and encouraged others to avoid the violence that pervaded his community. Immediately upon entering the United States, Mr. Campbell joined the United States Navy so that he could serve and protect his country. During his time in the Navy, Mr. Campbell served his country during wartime, received promotions and awards, and was discharged honorably. After leaving the Navy, Mr. Campbell went back to living a stable and prosocial life.

Mr. Campbell was in his early twenties at the time he commited the immediate offense. This fact is relevant because many courts, including this Honorable Court, have recognized that age plays a major role in the behavior and development of men. In United States v. McCoy, 981 F.3d 271 (4th Cir. 2020), the court noted that "the courts focused on the defendasnt's relative youth --from 19 to 24 years old--at the time of their offenses, a factor many courts have found relevant under §3582(c)(1)(a)."

Mr. Campbell argues that his youth and his background played a significant role in his participation in the immediate offense. While he took steps to mediate the impact of violence from his environment in his formative years, the fact that he was exposed to violence at this crucial point in his development lent itself strongly to his inability to fully consider the impact of his behavior. Addtionally, Mr. Campbell's continued exposure to violence in the theater of war at an early age also served to inure him to the significance of his violent act. By the time Mr. Campbell faced Judge Nickerson at the age of 31, he had already begun to understand the factors that drove him to involve himself in a heinous crime.

Another role that age and maturity play is their impact on recidivism. Mr. Campbell is now in his early 40s having spent

-13-

over 11 years incarcerated since his sentencing.  The National Institute of Justice ("NIJ") notes that age is a powerful factor in deterring crime and that criminals naturally age out of crime. Office of Justice Programs at the NIJ, Five Things About Deterrence, United States Department of Justice (May 2016)(citing Robert J. Sampson, John H. Laub, and E.P. Eggleston, On the Robustness and Validity of Groups, 20 Journal of Quantitative Criminology 1, 37-42)).  The Sentencing Commission's research also indicates that one of the two factors most closely associated with recidivism rates (criminal history and age), evidence that the older the age of the offender, the lower his or her recidivism rate.  See Recidivism Among Federal Offenders, A Comprehensive Overview, Perts II & IV (March 2016).

Mr. Campbell has worked hard to lower his recidivism and custody points since he arrived in the BOP.  He started his sentence at FCI Fairton, New Jersey, which is a medium custody yard. From FCI Fairton, Mr. Campbell reduced his custody points low enough to earn him a transfer to FCI Yazoo, Missouri, a medium-low custody facility.  In July 2024, Mr. Campbell had again lowered his recidivism and custody points to low earning him a transfer to FCI Englewood, Colorado, which is a low-custody facility. In order to effect these transfers, Mr. Campbell was required to maintain clear conduct, remain program compliant and active in programming, and obtain a erduction in his pattern score-- which is indicative of his success outside of prison as well as reflects his progress in prison.  Mr. Campbell entered the BOP with medium recidivism and medium custody scores that through hard work and clear conduct, he has reduced to low recidivism and low custody scores.

-14-

Mr. Campbell's efforts at rehabilitation since his incarceration have been exceptional and reflect his strong work ethic and moral fortitude that guide his life. As indicated by his attached educational certificates and transcripts, Mr. Campbell has continued to take courses and programs that are both required and voluntary. Mr. Campbell has maintained consistent employment through the UNICOR program in the BOP since he was incarcerated. Mr. Campbell was promoted to Quality Assurance Inspector while working for UNICOR at FCI Fairton. Due to his strong work ethic and his exceptional work performance, UNICOR enrolled and paid for Mr. Campbell to complete an out-of-prison Quality Management Course. Through this program, Mr. Campbell was trained and passed a test to become a Certified Quality Improvement Associate. According to one of Mr. Campbell's supervisors at UNICOR, Quality Assurance Manager Mr. O. Marti, Mr. Campbell's skill set would be an asset to any company. Mr. Campbell continues to work for UNICOR at his current facility, FCI Englewood, and continues to be an exemplary worker.

Mr. Campbell has taken multiple courses and programs while incarcerated in the BOP outside of his work at UNICOR. Some of the more notable coursework Mr. Campbell has completed while in custody include assorted vocational programs offered by the National Center for Construction Education and Research. His principal goal in taking and completing these programs is to prepare himself for a career in the construction industry. These courses included Introductory Craft Skill, Construction Site Safety Orientation, Core Curriculum, and Carpentry Level I. Mr. Campbell has also received certification from the American National Standards Institute ("ANSI") Conference for Food Protection

-15-

by completing the ServSafe Food Protection Manager Course.  Mr. Campbell's coursework, programming, and employment are well above the undertakings of the typical BOP inmate and reflect the high standards he sets for himself.

Much of Mr. Campbell's progress and success in the BOP come as a direct result of his faith and devotion to his religious beliefs and practices.  Mr. Campbell helps lead services for his Rastafarian Community.  He serves as a guide and a mentor for his fellow inmates and shows them by example how to follow a correct and religious path.  Mr. Campbell reaches out beyond his religious community to assist younger inmates with achieving balance and learning ethics that will allow them to succeed upon release from the BOP.  Religious Services Assistant A. Hudgon writes of Mr. Campbell's contributions to the Religious Service Department and his excellent work ethics.  Mr. Hudgon further states that he believes Mr. Campbell can and will be a productive and hard working citizen upon his release from the BOP.  Mr. Campbell's strength of character and his perseverance to succeed in the face of adversity have motivated him throughout his life and will continue to bring him success upon his release from the BOP.

RELEASE PLAN

Mr. Campbell would like to be released to a halfway house in either New Jersey or New York upon leaving the BOP.  He has family in both states who will assist him in assimilating back into society.  He believes he needs the time in a halfway house in order to reestablish himself in the job market and to reengage in the community.  Mr. Campbell plans to apply his previously acquired skillset as well as his new training to find a

-16-

long-term career in the field of construction. He believes this career path will allow him to continue to grow and expand as an individual as well as providing a challenging and rewarding source of income. Mr. Campbell's long-term goal in the construction industry is to own his own contracting company.

In order to meet his ongoing medical and mental health needs, Mr. Campbell will be using his VA benefits. He intends to continue in therapy to deal with his PTSD and any related issues. Mr. Campbell believes taking care of his mental health is a necessity in allowing him to lead a fulfilling and successful life. Ultimately, Mr. Campbell intends to take training to become a peer counselor or therapist in order to assist other veterans and/or former inmates who are struggling with reassimilating back into society.

CONCLUSION

Mr. Campbell believes he has set forth enough factual evidence to meet the standard of extraordinary and compelling circumstances. He has established that he has serious medical and mental health issues that leave him susceptible to substantial illness or death from exposure to COVID-19. As this Honorable Court has pointed out in numerous cases, the threat of COVID-19 is still a major concern in the world. Additionally, exposure is more likely to occur in closed environments such as penal institutions.

Another factor supporting Mr. Campbell's motion is the sentence disparity between his sentence and that of defendants of similar records who have been found guilty of similar or more heinous crimes than his. Mr. Campbell points out the disparity between his sentence and the sentence handed out in 2022 for

-17-

murder. Statistics reveal that Mr. Campbell is serving a dispropotionately greater sentence by almost ten years than the average defendant serving a sentence for murder. This sentencing disparity alone renders Mr. Campbell eligible for a sentence reduction under 18 U.S.C. §3582.

Since Mr. Campbell has provided enough evidence to support the court finding that he is eligible for a sentence reduction, the court can now look at the sentencing factors under 18 U.S.C §3553(a) and any other evidence the court finds relevant in reducing Mr. Campbell's sentence to a sentence that more fairly supports his circumstances. Mr. Campbell has presented evidence that he has lived a productive and meaningful life both inside and outside of prison. From his engagement with the youth of his community when he was growing up to his service in the U.S. Navy to his remarkable progress while in the BOP, Mr. Campbell establishes that but for one aberration in his life he is a productive and otherwise model citizen.

REQUEST FOR RELIEF

Mr. Campbell respectfully requests this Honorable Court grant his motion for compassionate release. He further requests this Honorable Court appoint counsel for him in this matter as he is a Pro Se litigant without funds who has limited knowledge and access to the law. Although not entitled, Mr. Campbell requests a hearing on the merits of this motion so that he might expand on any issues this Honorable Court would like clarified.

Done this 24 day of FEBUARY 2025.

Dellando Recardo Campbell, 71279097
FCI Englewood
9595 West Quincy Ave.
Littleton, CO  80123

-18-